Filed 10/19/20  P. v. Daniels CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B294435 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA085943) |
| v. | |
| DIONTE CLEVELAND DANIELS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Gregory A. Dohi, Judge.  Affirmed and remanded with directions.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Acting Assistant Attorney General, Zee Rodriguez and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

————————

Dionte Cleveland Daniels appeals from a judgment entered after the jury convicted him of three counts of forcible oral copulation, two counts of false imprisonment, first degree burglary, and dissuading a witness by force or threat arising from two incidents that took place in a tent in a homeless encampment.  The jury found true Daniels personally used a deadly or dangerous weapon (a knife) in the commission of two of the counts of oral copulation, the first degree burglary, and the false imprisonment.

On appeal, Daniels contends his federal and state constitutional rights were violated because he was improperly restrained in front of the jury and removed from the courtroom during a portion of the voir dire.  Further, Daniels argues the trial court abused its discretion in admitting testimony that suggested he was a gang member and testimony about his use of the knife recovered in this case in a prior incident.  Daniels also contends the trial court erred in admitting one of the victim's statements to a police officer as a spontaneous statement.  Daniels also maintains he was interrogated by the police in violation of his *Miranda*[1] rights.  We affirm.

---

[1]      *Miranda v. Arizona* (1966) 384 U.S. 436, 473-474 (*Miranda*).

# FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Information*

The information charged Daniels with three counts of forcible oral copulation (Pen. Code,[2] former § 288a, subd. (c)(2)(A); counts 1, 2 & 4), first degree residential burglary (§ 459; count 3), dissuading a witness by force or threat (§ 136.1, subd. (c)(1); count 5), and two counts of false imprisonment by violence (§ 236; counts 6 & 7).  As to counts 2 and 4 for forcible oral copulation, the information specially alleged Daniels used a deadly or dangerous weapon (a knife) (§§ 667.61, subds. (b) & (e)(3), 12022.3, subd. (a)); Daniels committed the offenses against more than one victim (§ 667.61, subds. (b) & (e)); and the offenses occurred during the course of a residential first degree burglary (§ 667.61, subds. (a) & (d)).  As to counts 3, 6, and 7, the information specially alleged Daniels personally used a deadly or dangerous weapon (a knife) (§ 12022, subd. (b)(1)).  Further, as to counts 1 through 5, the information specially alleged Daniels suffered a prior serious felony conviction within the meaning of section 667, subdivision (a)(1).  As to all counts, the information specially alleged Daniels suffered a prior conviction of a violent or serious felony under the three strikes law (§§ 667, subds. (b)-(j), 1170.12).

---

[2]  Further undesignated statutory references are to the Penal Code.

Daniels pleaded not guilty and denied the special allegations.

B.      *The Evidence at Trial*

In 2016 Fidel "Cindy" S. lived in a tent in a small homeless encampment by a freeway.  Around five other people, including Joel Valle and his girlfriend Angela, lived in the encampment. Cindy was close friends with Jose "Selina" P., whom Cindy had known for approximately eight years.[3]  Selina would visit Cindy at the encampment about once a week.

In 2017 Daniels, who was known as "Tay Tay," came to the encampment.  He told Cindy he had no family and did not have a place to stay.  Cindy offered Daniels use of her tent until he could get his own tent.  Cindy told Daniels he could stay in her tent when she went to recycle (to earn a living) at nighttime.  But he could not stay in her tent when she was inside, and he had to obtain her permission before he could enter.

Daniels initially got along with everyone in the encampment.  But Daniels became "mean" and began "bullying" when Valle's brother got upset with Daniels for riding his bicycle without permission.  A month and a half after joining the encampment, Daniels fought with Valle and Angela.  Valle saw Daniels grab Angela by the throat.  Cindy witnessed Daniels hitting Angela and telling her to "shut up" as he grabbed her by the hair and neck and "threw her very close to the freeway." Daniels told Cindy, "You're not going to call the police.  Because the police is not going to do anything to me."  Someone else called

---

[3]      We refer to Fidel S. and Jose P. by their chosen names (Cindy and Selina) and gender.

4

the police, and Daniels was arrested but later released. Cindy felt afraid when Daniels was released because of his repeated comments about being arrested but released. Valle moved to another campsite north of the encampment to get away from Daniels.

At some point, Daniels made a comment to Cindy about Selina's and Cindy's testimony in a prior trial about individuals who robbed them in a hotel in 2013. Cindy testified in this trial Daniels had stated "we were rats and because of us, it was our fault that his homies were in prison."[4] Daniels's statement made her "very scared."

### 1. *The April 30, 2017 incident (counts 1 & 5)*

Approximately 20 days after Daniels started living at the encampment, he proposed Cindy leave her partner Miguel and live with him. Daniels made advances to Cindy many times. Cindy told Daniels she only thought of him as a family member. Daniels responded "that if [she] refused him, he would do something to Miguel."

On the morning of April 30, 2017 Cindy was inside her tent when Daniels came in. Cindy asked him, "Why didn't you call me? Why didn't you tell me?" Daniels responded, "I'm tired of you refusing. I need you to suck my dick." Cindy replied, "Tay Tay, please understand, I can't do that with you, because I love my partner very much." Daniels asked, "Oh, so you're not going to do it?" Then he grabbed Cindy by her hair with both fists and

---

[4] Los Angeles Police Sergeant Maricela Vargas, the investigating officer, testified she conducted a search of the police databases and concluded Daniels was not affiliated with any gang.

stated, "I already told you. You already know if you don't do this, you know what I'm going to do to Miguel." Daniels pulled his pants down, moved Cindy's head toward his groin, and put his penis in and out of her mouth for about 10 minutes.

After Daniels ejaculated on Cindy's shirt, he told Cindy "to not tell anybody" or call the police. Daniels stated if Cindy "called the police and he ended up in jail, his brother would come and do something to [her]." Cindy told Selina about the incident the next day. But she did not tell Selina, who had a cell phone, to call the police. Cindy did not contact the police "[b]ecause [she] was very scared that [Daniels] was going to do something to [her] or Miguel."

### 2.     *The May 2, 2017 incident (counts 2-4, 6 & 7)*

On the night of May 1, 2017 Selina decided to stay in the tent with Cindy after Cindy told her she "was very scared" of Daniels. The next morning at approximately 5:30 or 6:00, Daniels came inside the tent with a foot-long knife in his hand and woke up Cindy by pulling her by the hair. Daniels angrily said, "Hey, you fucking bitch" and "Were you already talking with Chaparro?" Cindy responded, "Yes. What's wrong with that?" Daniels asked, "Well, why do you not want to be with me and you have relations with other people?" Cindy replied, "I didn't have relations. I'm just talking to him. I have no reason to explain that to you. And you are not somebody that I need to give explanations to." When Daniels asked Cindy why she did not want to live with him, Cindy responded she only saw him as a brother. Daniels then demanded, "You've got to suck my dick." Cindy was "very frightened because he had a knife" in his right

6

hand pointed "very close" to her while clenching her hair with his left hand.

Daniels hit Cindy in the right ribcage with a closed fist, slapped her two or three times on her cheek, and squeezed her neck with his left hand. Selina woke up and told Daniels to leave Cindy alone and not to hit her. Daniels slapped Selina on the right side of her face and told her to "shut up." Selina tried to leave the tent, but Cindy told her, "No, don't run. He's either going to hurt you with the knife or me." Daniels told Selina not to move, and then said, "Both of you are going to have to suck my dick." Selina stated, "I don't like that." Daniels responded, "If you don't suck my dick, you know what's going to happen with Cindy." Cindy said, "S[e]lina, please, sweetie. Please." Selina replied, "Okay, Cindy, but no crying."

Cindy testified Daniels pulled his pants down to his knees and dropped the knife. He pushed Cindy's head into his groin area and forced her to perform oral sex on him. Then Daniels pulled down Selina's pants to have anal sex with her, but she told him she was HIV positive, and neither she nor Cindy had a condom. Daniels then forced Selina to perform oral sex on him by pointing a knife at her neck, then pointing the knife toward Cindy. He told Selina, "Do you want to suck my dick, or I'll kill you[?]" Daniels grabbed Selina by the back of her neck and forced her head down to perform oral sex on him. Cindy said in Spanish, "S[e]lina, make him come on your clothing, or your body so that there will be evidence so we can call the police." Daniels asked, "What are you telling her?" Cindy responded, "Nothing, that I don't feel well."

After Daniels ejaculated on Selina's shirt, he made Cindy and Selina lie down and said he wanted to live with them. Daniels lay down between Cindy and Selina with the knife within his reach under the blanket. An hour later about 9:00 a.m., Cindy and Selina both asked to leave, but Daniels only allowed Selina to leave to see her mother, and Daniels told her Cindy could only leave when Selina returned.

Selina left the tent, crossed the street to a wooded area, and cried before falling asleep. She did not immediately call the police because she was tired, confused, and worried Daniels might harm Cindy. When Selina woke up at about 1:00 or 1:30 p.m., she sought out Valle and asked him to call the police with her cell phone, which he did. Valle noticed Selina looked "real tired," but he did not learn about the details of the sexual assaults until later.

3. *The police investigation and Daniels's arrest*

Los Angeles Police Officers Joshua Gonzales, Alejandro Carrillo, and Lizbeth Luna arrived at the encampment at 5:00 or 6:00 p.m. on May 2, 2017. Cindy was still inside her tent with Daniels when she heard a police officer say, "Come. Come here." Daniels told her, "Go." When Cindy went outside her tent, Officer Gonzales asked Officer Luna to speak with her because Officer Luna spoke Spanish.[5] Cindy told Officer Luna that morning Daniels had hit Selina and her, pulled his pants down, grabbed a large gray knife, and made them perform oral sex

___

[5] The prosecutor played the video of Officer Luna's conversation with Cindy in Spanish, which was recorded by Officer Gonzales's body camera. The prosecutor also provided the jurors with a certified translation of the recorded conversation.

8

before he ejaculated on Selina's clothes. Cindy looked visibly distraught and cried as she described what had happened. Officer Carrillo, who had previously encountered Daniels and called him "Tay Tay," asked Daniels to come out of the tent, then arrested and handcuffed him when he exited.[6] Officer Gonzales recovered a knife with an eight-inch-long blade from under Cindy's tent, and Cindy confirmed it was the knife Daniels used that day. At trial Selina identified the knife as the one Daniels used to force her to perform oral sex on him. The prosecutor also showed Valle the knife at trial and asked whether he had seen the knife before. Valle responded, "I believe the day that [Daniels] grabbed Angela. I believe he had it a couple more times after that."

Los Angeles Police Sergeant Maricela Vargas interviewed Cindy and Selina at the police station. Sergeant Vargas testified Cindy and Selina appeared nervous and upset and were "were a little dirty, a little disheveled." During the interview, Sergeant Vargas showed Selina a photograph of the knife. Selina recognized the knife as the one she put inside the tent for protection when she stayed over with Cindy. Selina told Sergeant Vargas she did not see the knife during the May 2, 2017 incident. Sergeant Vargas obtained a shirt from Selina and had it tested for DNA.

---

[6]     The prosecutor played the video of Officer Carrillo's conversation with Daniels, which was recorded by Officer Carrillo's body camera. The prosecutor also provided the jury with a 20-page transcript of the recorded conversation.

The parties stipulated a forensic lab analyst performed a DNA analysis and concluded (1) a swab taken from Selina during the May 2, 2017 sexual assault exam matched Daniels's DNA and (2) sperm on Selina's shirt matched Daniels's DNA. The parties also stipulated forensic lab analysts were unable to analyze the DNA taken from the knife or obtain any fingerprints from the knife.

On May 2, 2017 at approximately 9:00 p.m., Leticia Tapia-Jaffe, a registered nurse who was a forensic and sexual assault nurse examiner, conducted a physical exam and forensic interview of Cindy. Tapia-Jaffe took photographs of Cindy's injuries during the physical exam, which were shown to the jury. Tapia-Jaffe testified Cindy had two-inch and three-inch lacerations on her scalp. In addition, Cindy "had some moderate redness" and "a couple of dark marks" on her neck. Cindy told Tapia-Jaffee she had been choked and felt soreness in her arms, scalp, and neck. Tapia-Jaffe testified Cindy "was emotional," "crying," and occasionally "jittery or shaky" during the interview.

Daniels did not testify or call any witnesses.

C.     *The Verdicts and Sentences*

The jury found Daniels guilty of forcible oral copulation of Cindy (counts 1 & 4) and Selina (count 2), first degree burglary (count 3), dissuading a witness (Cindy) by force or threat (count 5), and false imprisonment by violence of Cindy (count 6) and Selina (count 7). As to counts 2 and 4 for forcible oral copulation, the jury found true Daniels personally used a deadly or dangerous weapon; Daniels committed the offenses against more than one victim; and the offenses occurred during the course of a residential first degree burglary. As to counts 3, 6,

and 7, the jury found true Daniels personally used a deadly or dangerous weapon.

The trial court sentenced Daniels to an aggregate prison term of 66 years to life.  The court sentenced Daniels on counts 2 and 4 for forcible oral copulation during the course of a burglary (§ 667.61, subds. (b) & (e)) to 25 years to life on each count, plus a consecutive middle term of four years for use of a knife (§ 12022.3, subd. (a)).  The court imposed and stayed two terms on each count of 15 years to life for the multiple victims and personal use weapon circumstances (§ 667.61, subds. (b) & (e)).

On count 1 for forcible oral copulation of Cindy, the court imposed a consecutive term of eight years (the upper term) "given her vulnerability as a homeless person in a tent, away from the public view."  On count 3 for first degree burglary, the court imposed and stayed the middle term of four years[7] plus one year for the weapon enhancement (§ 12022, subd. (b)(1)).  On count 5 for dissuading a witness, the court imposed and stayed the middle term of three years.[8]  On count 6 for false imprisonment of

_____

[7]     Although the court stated it was imposing the middle term of two years, the minute order and abstract of judgment correctly reflect imposition of a four-year middle term for first degree burglary under section 461, subdivision (a).

[8]     The minute order and abstract of judgment incorrectly state the trial court imposed and stayed an additional one year term for a personal use weapon enhancement (§ 12022, subd. (b)(1)) on count 5.  But the information did not specially allege, and the jury did not make a finding on personal use of a weapon on count 5.  We order the minute order and abstract of judgment corrected to remove the one-year weapon enhancement imposed and stayed on count 5.  (*People v. Jones* (2012)

Cindy, the court imposed and stayed the middle term of two years plus one year for the weapon enhancement (§ 12022, subd. (b)(1)). On count 7 for false imprisonment of Selina, the court imposed and stayed the middle term of two years plus one year for the weapon enhancement (§ 12022, subd. (b)(1)).

Daniels timely appealed.

## DISCUSSION

A. *Restraining Daniels with a Lap Belt During Trial Did Not Violate His Constitutional Rights*

1. *The trial court proceedings*

One day before jury selection, the trial court raised a "security issue" posed by Daniels's statement in lockup. The courtroom deputy reported Daniels said something to the effect of "[if] these white people don't make the right decision, I'm going to go off." The court stated, "I'll note that during court in previous sessions, Mr. Daniels has addressed the prosecutor directly, has sort of spontaneously made some remarks—I wouldn't call them necessarily outbursts, but inappropriate remarks. [¶] In light of what he said about potentially going off, . . . I am finding . . . there's a need to take additional security measures that would not be visible to the jury, specifically, Mr. Daniels would be belted to the chair in a way that the jurors couldn't see. [¶] I don't

---

54 Cal.4th 1, 89 ["When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, this court has the inherent power to correct such clerical error on appeal, whether on our own motion or upon application of the parties."]; *People v. Mitchell* (2001) 26 Cal.4th 181, 185 ["Courts may correct clerical errors at any time . . . ."].)

12

believe that there are any reasonable measures we would take that are less restrictive. He would have his hands free during the trial. He could still confer easily with counsel. He just couldn't stand up. [¶] So I would instruct the lawyers not to stand up when the jurors come and go, although that might be their practice just so as to not to highlight the fact that Mr. Daniels can't. [¶] The only other measures that could possibly be taken would involve using additional bailiffs and that would not necessarily make things safer, and it would be difficult to arrange staffing wise."

Defense counsel objected to the use of a physical restraint on Daniels. Defense counsel argued, "In my interactions with Mr. Daniels, I've never felt like I personally have had a safety concern. He's been respectful to me. He does have a very gregarious personality and sometimes make comments that are off-the-cuff. [¶] I understand everyone's concern about the statement going off, however, I would say that . . . I don't feel like it rises to the level that the court needs to take an extra security measure and restrain him. I'm most concerned about his ability to have a fair trial and that jurors may already, in observing him sitting at defense table, have a bias against his innocence. And so any further restraint could lead to an unfair proceeding for him."

The trial court observed Daniels was "gregariously looking around," "making eye contact with the deputies," and "smiling," and "there's nothing wrong with that." But the court explained, "In the past he has made remarks such as he asked the district attorney directly whether she was going to be at the next hearing, things like that, which indicate to me that perhaps Mr. Daniels might have some issues in restraining himself, and

13

he's laughing right now.  [¶]  So based on everything I've seen, it's appropriate . . . to take the minimal steps . . . of just putting the security belt, not visible to the jurors, so that Mr. Daniels can't leave his chair."

       2.    *Governing law*

"'In general, the "court has broad power to maintain courtroom security and orderly proceedings" [citation], and its decisions on these matters are reviewed for abuse of discretion. [Citation.]  However, the court's discretion to impose physical restraints is constrained by constitutional principles.  Under California law, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." [Citation.]  Similarly, the federal "Constitution forbids the use of visible shackles . . . unless that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial.""" (*People v. Bell* (2019) 7 Cal.5th 70, 123 (*Bell*); accord, *People v. Young* (2019) 7 Cal.5th 905, 934 (*Young*).)

""In deciding whether restraints are justified, the trial court may 'take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.' [Citation.]  These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior." [Citation.]  Although the court need not hold a formal hearing before imposing restraints, "the record must show the court based its determination on facts, not rumor and innuendo.""" (*People v. Bryant, Smith and Wheeler*

14

(2014) 60 Cal.4th 335, 389 (*Bryant*) [requiring defendant to wear stun belt under his clothing was not an abuse of discretion where defendant was part of a large-scale and extremely violent drug organization whose members had been disruptive in prior trials, including attempting to kill prosecution witnesses]; accord, *Young, supra*, 7 Cal.5th at pp. 934-935 [use of concealed leg chain to restrain defendant was not an abuse of discretion where defendant had previously possessed weapons in custody and had attacked another inmate, although he had been respectful in court].)  However, "even when the record establishes a manifest need for restraints, the restraint imposed must be the least obtrusive or restrictive one that would be effective under the circumstances." (*People v. Simon* (2016) 1 Cal.5th 98, 115; accord, *People v. Virgil* (2011) 51 Cal.4th 1210, 1271.)

""" "[W]e will not overturn a trial court's decision to restrain a defendant absent 'a showing of a manifest abuse of discretion.'" [Citation.]  To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it "falls outside the bounds of reason."'" (*People v. Miracle* (2018) 6 Cal.5th 318, 346; accord, *Bryant, supra*, 60 Cal.4th at p. 390.) Further, "" "courtroom shackling, even if error, [is] harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense."'" (*Young, supra*, 7 Cal.5th at p. 935; accord, *People v. Williams* (2015) 61 Cal.4th 1244, 1259.)

15

3.  *The trial court did not abuse its discretion in restraining Daniels, and any error was harmless*

Daniels contends the use of a physical restraint during trial violated his state and federal constitutional rights to due process and a fair trial because there was no showing of a manifest need to restrain him. His contention lacks merit.

The trial court ordered the use of a lap belt to physically restrain Daniels because Daniels threatened "to go off," and he had made "inappropriate remarks" at prior court proceedings. The court reasoned the lap belt was the least obtrusive and restrictive restraint because it was not visible to the jury and Daniels "could still easily confer with counsel" and "have his hands free during the trial." Further, the court ordered the attorneys to stay seated when the jurors entered and exited the courtroom to avoid highlighting Daniels's inability to stand. Given Daniels's statement he might "go off," the trial court's reasoned decision to use a lap belt, not visible to the jury, was not an abuse of discretion.

Further, any error in using the lap belt to restrain Daniels during trial was harmless because the belt was not visible to the jury and there is no evidence the belt impaired Daniels's right to testify or participate in his defense. (*Young, supra*, 7 Cal.5th at p. 935; see *People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 910-911 [any error in belting defendants to their chairs and handcuffing one hand concealed by use of a drape over counsel table was harmless because there was no evidence jury saw the restraints or the restraints impaired the defendant's right to testify or participate in their defense].) Here, there is no evidence the lap belt "influenced [Daniels] not to testify, affected his demeanor or impaired his ability to communicate with defense

16

counsel." (*People v. Williams, supra*, 61 Cal.4th at p. 1259 [any error in using leg restraint was harmless]; accord, *People v. Combs* (2004) 34 Cal.4th 821, 839 ["[D]efendant did not testify at the guilt or penalty phase of trial, and there is no evidence or claim his leg restraints influenced him not to do so, or that they distracted him or affected his demeanor before the jury."].)

B.     *The Trial Court's Exclusion of Daniels from the Courtroom During Voir Dire Did Not Violate His Constitutional Rights*
       1.     *The trial court proceedings*

At the October 23, 2018 morning session, prior to jury selection, the trial court addressed Daniels, "Mr. Daniels, just a really quick warning:  You're a lively person, and that's just the way you are.  But please do the best . . .  [¶]  . . . [¶]  . . . to your best ability, don't blurt anything out.  You may not want to touch anybody else.  And this morning you have been absolutely fine."

Jury selection resumed the next morning and continued in Daniels's presence until the afternoon break.  At the start of the afternoon session on October 24, outside the presence of the jury, the trial court noted that Daniels may have again remarked about "going off" at trial, and the court warned Daniels, "Mr. Daniels, you have the right to be at your trial.  And I want to honor that right.  I want you to be able to see what's going on because you have so much at stake.  But, if things get out of hand, and especially if people start feeling threatened, then I do have the authority to say you can sit this one out and we'll just pipe the sound into you.  [¶]  I don't want to have to do that.  Frankly, I don't even know if we can.  But I'm going to ask that, for starters, I understand something else might have been said to the effect that you're going to go off."  The court inquired, "Is that

17

what you're telling me right now?"  Daniels responded, "I'm confirming I said that."

After the trial court gave Daniels an opportunity to talk to his attorney, the court asked Daniels, "Are you telling me that you're going to go off?"  Daniels answered, "No.  I just told you that's what I said."  The following colloquy ensued:

"The court:  Okay.  So let me ask you now, are you going to go off?

"[Daniels]:  I don't know.  We have to cross that bridge when we get there, and that's the dead honest truth.

"The court:  We have to think about how we're going to proceed now.  So, as you know, my main concern is security.  I have to keep people safe.  I want to honor your right here, but I need people to be safe.

"[Daniels]:  I understand.  I understand.  I'm not safe.

"The court:  You are not safe?

"[Daniels]:  No, I am not.

"The court:  Are you telling me now you cannot control yourself?

"[Daniels]:  I'm telling you now I can control myself fine, yes.

"The court:  But you're going to go off?

"[Daniels]:  No.  I didn't say that.  I said we have to cross that bridge when we get there."

At this point the court said to Daniels, "You're smiling.  You seem to be joking.  Here's the deal."  Daniels interrupted, "Can I get some gummy bears?"  The court stated, "I can give you a glass of water, but I can't give you some bears."  Daniels

responded, "Those bears are what I need.  I swear if you give me five gummy bears, I wouldn't say anything."  The court stated, "So here's the deal:  I know you want the gummy bears.  Here.  All right.  Look."  Daniels again interrupted, "You give me gummy bears, I'll take 42 years . . . ."  Defense counsel told Daniels, "Dionte, don't joke about taking the 42 years."

The court stated to Daniels, "You can look at those folks right now, these deputies who are here.  Are you telling me that you are not going to cause a problem in court?  Is that what you're saying?"  Daniels responded, apparently referring to a deputy in the courtroom, "You a sister.  I'm not going to put my hands on you."

The trial court then queried, "I'm going to ask you straight up because we're having this conversation.  So here's what we're doing, straight up, are you going to go off during the trial?  Yes or no?  Yes or no?"  Daniels responded, "Lower your voice."  The court again asked, "Yes or no?"  Daniels replied, "Just lower your voice.  Let's calm down.  We're both men here.  Let's keep the respect level—."  The court interjected, "I'm going to ask that Mr. Daniels be removed.  All right.  We have to take some steps here."

Defense counsel requested the trial court allow Daniels to remain in the courtroom, explaining she did not feel Daniels was a threat to her.  Daniels added, "Oh, Lord.  I thought we was going to cross that bridge like Shrek and Donkey.  Did you see that movie?  Shrek, I'm looking down."  The trial court explained its decision to remove Daniels from the courtroom:  "First, Mr. Daniels has previously said, on at least two occasions now according to the deputies, that he was going to go off, depending on what happened in this courtroom.  He confirmed to me just

now that he couldn't guarantee he wasn't going to go off. He confirmed having made those statements to the deputy. [¶] He's behaving, right now, in a manner that is seemingly friendly, is pretty irrational, and is erratic." The court added that Daniels's "behavior in this courtroom has become increasingly erratic, not necessarily threatening, it's always laughing, but he'll hold up his fist, he'll make gestures, he'll try and engage with me in the manner that is too casual."

The prosecutor added, "I understand that during the proceedings, especially when the attorneys and Your Honor go into a sidebar, that the defendant has a tendency to speak audibly under his breath and make comments that other staff members have heard, and I'm sure that the jurors have heard that. He has repeatedly, spontaneously put his arms up into the air in front of the room full of jurors. [¶] One juror actually brought it to our attention that it was distracting and potentially prejudicial to her and she would assume other jurors as well, that over the lunch hour, I think that some of his behavior in lockup was even more erratic than it had been prior to today."

The trial court then inquired of the courtroom deputy, who responded, "Before we broke for lunch, [Daniels] stated that he ha[d] nothing to lose." The deputy also recounted Daniels had said something to another deputy, who responded, "Are you threatening me?" The deputy reported further that during the lunch break Daniels "took his clothes off and he threw them out of the door and began kicking." Daniels asked for his attorney and kicked against the door for about 15 minutes.

The trial court concluded based on "the totality of these circumstances, the defendant has been deemed to have voluntarily absented himself from these proceedings." But the

20

court ordered Daniels to be brought back every day. The court stated, "If he is in a different state of mind when he comes back tomorrow, he might be allowed to stay with the restraint that we have been using, the lap belt."

Daniels was not present in the courtroom for remainder of the afternoon session on October 24, 2018. When the jurors returned to the courtroom, the court inquired whether the prosecutor and defense counsel wanted to exercise a peremptory challenge. Both declined and accepted the panel. The prosecutor and defense counsel also accepted the two alternative jurors. Once the panel and alternates were sworn in, the jurors were excused for the day.

Daniels was present in the courtroom the next morning when defense counsel made a motion for him to remain in the courtroom. Before ruling, the trial court heard from another courtroom deputy who reported Daniels was "very hostile" and "insinuated some type of threat towards" the deputy. The deputy stated Daniels later calmed down and apologized. The deputy opined Daniels was "a little more subdued today," and if Daniels was restrained by the lap belt, the deputy did not see any security issue. After the court received confirmation from Daniels he would control himself, the court allowed him to remain in the courtroom for the rest of the trial.

2.    *Governing law*

""Broadly stated, a criminal defendant has a right to be personally present at certain pretrial proceedings and at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, the due process clause of the Fourteenth

21

Amendment to the United States Constitution, section 15 of article I of the California Constitution, and sections 977 and 1043.”’” (*People v. Sandoval* (2015) 62 Cal.4th 394, 431; accord, *Illinois v. Allen* (1970) 397 U.S. 337, 338 [“One of the most basic of the rights guaranteed by the Confrontation Clause is the accused’s right to be present in the courtroom at every stage of his trial . . . .”]; *Bell, supra*, 7 Cal.5th at p. 114 [“A criminal defendant accused of a felony has the constitutional right to be present at every critical stage of the trial.”]; see § 1043, subd. (a) [“Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial.”].) “Voir dire of prospective jurors is ‘a critical stage of the criminal proceeding, during which the defendant has a constitutional right to be present.’” (*People v. Wall* (2017) 3 Cal.5th 1048, 1059, quoting *Gomez v. United States* (1989) 490 U.S. 858, 873.)

But a defendant’s constitutional right to be present “‘“may be lost by consent or at times even by misconduct.”’” (*People v. Gutierrez* (2003) 29 Cal.4th 1196, 1202; accord, *Illinois v. Allen, supra*, 397 U.S. at p. 343 [“[A] defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.”]; *People v. Welch* (1999) 20 Cal.4th 701, 773 [“[A] defendant may waive his right to be present at his trial by being disruptive at the trial, and appellate courts must give considerable deference to the trial court’s judgment as to when disruption has occurred or may reasonably be anticipated.”]; see § 1043, subd. (b)(1) [“The absence of the defendant in a felony case after the trial has

22

commenced in his presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases:  [¶]  (1) Any case in which the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom."].)

"'On appeal, we apply the independent or de novo standard of review to a trial court's exclusion of a criminal defendant from pretrial and trial proceedings, either in whole or in part, "insofar as the trial court's decision entails a measurement of the facts against the law."'" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1235; accord, *People v. Perry* (2006) 38 Cal.4th 302, 311-312.)  "[W]e evaluate federal constitutional error for harmlessness under the *Chapman* beyond a reasonable doubt standard, and state law error under the *Watson* reasonably probable standard." (*People v. Perez* (2018) 4 Cal.5th 421, 438, citing *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) & *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); accord, *People v. Mendoza* (2016) 62 Cal.4th 856, 901-902.)

> 3.    *The trial court properly excluded Daniels for part of the voir dire, and any error was harmless*

Daniels contends the trial court violated his state and federal constitutional rights by removing him from the courtroom, arguing he did not disrupt the trial with violence, threats of violence, or abusive behavior.  Removal of Daniels from the courtroom did not violate his constitutional rights, and even if there was a violation, any error was harmless.

23

On the first day of jury selection, Daniels told a courtroom deputy "he ha[d] nothing to lose," and he made a statement to another deputy that made the deputy feel threatened.  During the lunch break, Daniels "took his clothes off and he threw them out of the door and began kicking."  Daniels requested his attorney and continued to kick the door for about 15 minutes.  The prosecutor also reported that during voir dire that morning Daniels had "repeatedly, spontaneously put his arms up into the air in front of the room full of jurors" and that one juror had informed the prosecutor Daniels's conduct was distracting and potentially prejudicial to her and other jurors.

Following the lunch break, the trial court warned Daniels that he would be removed "if things get out of hand, and especially if people start feeling threatened . . . ."  The court asked Daniels whether he had made another statement that he was "going to go off."  Daniels confirmed that he did.  As discussed, Daniels had made a statement the prior day that if "these white people don't make the right decision, I'm going to go off."  The court repeatedly asked Daniels to provide assurances he would not "go off," but Daniels refused, instead stating, "[W]e have to cross that bridge when we get there."  When the court emphasized the need to keep people in the courtroom safe, Daniels responded, "I'm not safe," and he again refused to commit he would not "go off" later in the trial.

Further, Daniels made flippant remarks in response to the court's repeated inquiries, including offering to accept a 42-year sentence if the court gave him gummy bears.  When the court again asked Daniels whether he was "going to go off during the trial," Daniels responded, "Just lower your voice.  Let's calm down.  We're both men here.  Let's keep the respect level—."  The

24

court observed Daniels's behavior had become increasingly erratic, and Daniels had held up his fist and made gestures. Given Daniels's refusal to confirm he would behave appropriately notwithstanding the trial court's warning he would be removed if "things get out of hand" and "if people start feeling threatened," and his erratic and disrespectful behavior, the trial court did not err in removing Daniels from the courtroom during a portion of the voir dire.

Further, any error in excluding Daniels from the courtroom during the brief period of voir dire following the lunch break was harmless beyond a reasonable doubt. (*People v. Perez, supra*, 4 Cal.5th at p. 438 [applying *Chapman* standard for federal constitutional error]; *People v. Mendoza, supra*, 62 Cal.4th at pp. 902-904 [error in excluding defendant was harmless under *Watson* and *Chapman*].)  By the time Daniels was removed from the courtroom, the attorneys had completed their questioning of prospective jurors.  The portion of the voir dire conducted in his absence included only the attorneys' acceptance of the panel and the alternates.  On appeal, Daniels does not argue he did not have an adequate opportunity to discuss the peremptory challenges with his attorney, instead arguing he was prejudiced by the jury believing from his absence that he was a violent person who was likely guilty.  But Daniels was present during the remainder of the trial, including during all the witness testimony and closing arguments.  Further, the court properly admonished the jury, "Mr. Daniels is with us for today.  He was not here for part of yesterday.  Whether he's here or not is a nonfactor.  It's not part of the evidence and nothing you are permitted to consider."  The court further instructed the jury, "The defendant, Mr. Daniels, was not present during an early

25

portion of the trial.  During your deliberations, you are not to consider his absence for any purpose or speculate as to the reasons for it."  We presume the jury understood and followed the trial court's instructions.  (*People v. Flores* (2020) 9 Cal.5th 371, 405; *People v. Frederickson* (2020) 8 Cal.5th 963, 1026.)

C.    *The Trial Court Did Not Abuse Its Discretion in Admitting the Challenged Evidence*
      1.    *The trial court did not abuse its discretion in admitting Cindy's testimony that Daniels called her and Selina "rats" for testifying against his "homies"*

Daniels contends the trial court abused its discretion in admitting Cindy's testimony that she and Selina had testified in a 2013 case about being robbed at a hotel, and that Daniels told them afterward they "were rats and . . . it was [their] fault that his homies were in prison."  Cindy also testified Daniels's statement made her feel "very scared."  Daniels argues Cindy's reference to a robbery by Daniels's "homies" showed his gang affiliation and should have been excluded as more prejudicial than probative under Evidence Code section 352.  The trial court did not abuse its discretion.

Prior to trial, defense counsel had sought to exclude this testimony and testimony that Daniels was an 18th Street gang member as more prejudicial than probative under Evidence Code section 352.  The trial court excluded any reference to the 18th Street gang, but it allowed Cindy to testify about the robbery and that Daniels called her and Selina "rats" for testifying about his "homies," to show she feared Daniels and therefore did not call the police.

26

"'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*People v. Hardy* (2018) 5 Cal.5th 56, 87; accord, *Bryant, supra*, 60 Cal.4th at pp. 405-407.) "'[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues."'" (*People v. Jones* (2017) 3 Cal.5th 583, 610; accord, *Bell, supra*, 7 Cal.5th at p. 105 ["'"Evidence is not prejudicial, as that term is used in a [Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent."'"].) "'[T]he trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal absent an abuse of that discretion.'" (*Hardy*, at p. 87; accord, *Bell*, at p. 71.)

The trial court did not abuse its discretion in admitting the evidence. Cindy did not implicate Daniels in the prior hotel robbery or testify it was gang-related. Further, Sergeant Vargas testified Daniels was not affiliated with any gang. Daniels's statement that Cindy and Selina were "rats" for testifying against his "homies" was relevant to show Cindy's fear of Daniels

and why she did not report the April 30, 2017 incident to the police. The court did not abuse its discretion in finding the minimal prejudice from the reference to Daniels's "homies" was outweighed by the probative value in showing why Cindy did not call the police after the first sexual abuse incident.

2. *The trial court did not abuse its discretion in admitting Valle's testimony that he had seen Daniels use the same knife in a prior battery on Angela*

Daniels contends the trial court abused its discretion in admitting Valle's testimony that he previously saw Daniels use the same knife found in the tent in a prior battery on Angela because the evidence improperly suggested that because Daniels had used a knife before, he must have used it again in the May 2, 2017 alleged incident. In a pretrial hearing the trial court overruled defense counsel's objection, finding, "[T]he events witnessed by Mr. Valle are relevant, both to show that the knife belonged to Mr. Daniels and to explain why Cindy didn't report the event initially and to the elements of force and fear." When defense counsel renewed her objection at trial, the court confirmed its prior ruling, stating "the prior incident is relevant to show that Mr. Valle has seen the knife before and seen Mr. Daniels wielding it." The trial court did not abuse its discretion.

"[Evidence Code s]ection 1101(a) 'expressly prohibits the use of an uncharged offense if the *only* theory of relevance is that the accused has a propensity (or disposition) to commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the occasion of the charged offense.' . . . Section 1101(b) provides for the admission of

28

uncharged acts when relevant to prove some other disputed fact." (*Bryant, supra*, 60 Cal.4th at p. 406, citations omitted; accord, *People v. Cage* (2015) 62 Cal.4th 256, 273 (*Cage*) ["Evidence of defendant's commission of other crimes, civil wrongs or bad acts is not admissible to show bad character or predisposition to criminality, but may be admitted to prove some material fact at issue such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident."].)[9] We review the trial court's evidentiary rulings for an abuse of discretion. (*Cage*, at p. 274; *Bryant*, at p. 405.)

At trial, the prosecutor showed Valle the knife recovered from under Cindy's tent, and Valle testified he had seen the knife before, stating, "I believe the day that [Daniels] grabbed Angela. I believe he had it a couple more times after that." Because Valle's testimony tended to prove the disputed fact that Daniels had used the knife found under Cindy's tent in the May 2, 2017 incident, it was not an abuse of discretion to admit the testimony for that purpose, even though it arguably showed Daniels had a propensity for violently using a knife. (*Cage, supra*, 62 Cal.4th at p. 273; *Bryant, supra*, 60 Cal.4th at p. 406.)

---

[9] Evidence Code section 1101, subdivision (a), provides that, with specified exceptions, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Evidence Code section 1101, subdivision (b), provides admission of evidence a person committed a crime or other act is not barred "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . .) other than his or her disposition to commit such an act."

Daniels also argues Valle's statement he believed it was the same knife was equivocal, and thus it should have been excluded because it had less probative value, and further, Selina's statement to police officers that she had placed the knife in the tent undermined Valle's testimony. But any uncertainty as to whether it was the same knife goes to the weight of the evidence, not its admissibility. (*People v. Alcala* (1992) 4 Cal.4th 742, 797 ["the trial court properly could determine that despite the relatively weak probative value of the knife sets, they might have some tendency to prove that defendant had access to, or familiarity with, the particular brand of carving knife found near the crime scene"]; *People v. Clark* (1992) 3 Cal.4th 41, 129 [although the two knives were not "directly or conclusively connected to the offenses," they "were circumstantially relevant"].)

3. *Cindy's statements to Officer Luna were admissible as spontaneous statements*

Prior to trial, the prosecutor sought to admit Cindy's initial statements to Officer Luna made when Cindy exited the tent as spontaneous statements pursuant to Evidence Code section 1240. Defense counsel objected, arguing Cindy "will be able to testify as to all of the activity that occurred, as well as her feelings and any potential fear or force that she may have felt was being used." Defense counsel also argued the statements were unduly prejudicial under Evidence Code section 352, adding "[i]t's unfair to Mr. Daniels because the witness is available and she can say everything that is in that body cam video." The trial court ruled Cindy's statements were admissible as spontaneous statements, noting "[i]t's actually, I think, fairer to Mr. Daniels precisely

30

because the witness is available and therefore can be cross-examined as to the statements made at the scene." At trial, defense counsel renewed her objection on the same grounds, that Cindy had testified to what had happened and the evidence was more prejudicial than probative. The trial court again overruled the objection, explaining "[t]he triggering events [are] not only . . . the actual forcible oral copulation that she describes, but it's also with Mr. Daniels presumably armed with a knife and so it's an ongoing triggering event."

On appeal, Daniels contends the admission of Cindy's statements to Officer Luna was erroneous because they were not spontaneous statements. But Daniels forfeited his claim of error because he failed to object on this ground at trial. (Evid. Code, § 353, subd. (a); *Cage, supra*, 62 Cal.4th at p. 282 ["Defendant forfeited his claims by failing to object to any of the testimony on the grounds he now raises."]; *People v. Fuiava* (2012) 53 Cal.4th 622, 721 ["'"In accordance with [section 353 of the Evidence Code], we have consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable."'"].)

Even if Daniels had not forfeited his evidentiary challenge, the trial court acted within its discretion in admitting Cindy's statements to Officer Luna under the spontaneous statement exception to the hearsay rule. "'Evidence Code section 1240 provides that "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement" "[p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant" and "[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception." . . . [¶] "To be admissible, '(1) there must be some

31

occurrence startling enough to produce . . . nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it."'"" (*People v. Sanchez* (2019) 7 Cal.5th 14, 39; accord, *People v. Penunuri* (2018) 5 Cal.5th 126, 156.)

Daniels contends Cindy's statements are not spontaneous statements within the meaning of Evidence Code section 1240 because Cindy spent hours lying in her tent with Daniels before making statements to Officer Luna. But Daniels had a knife within reach during that time and ordered Cindy to stay in the tent after forcing her to perform oral sex at knifepoint. Daniels did not permit Cindy to leave until the responding officers arrived. "'"[N]either lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.*"'"" (*People v. Penunuri, supra*, 5 Cal.5th at p. 152 [declarant's statement that defendant pointed a gun at him which was made 20 to 40 minutes after his encounter with defendant was spontaneous]; accord, *People v. Brown* (2003) 31 Cal.4th 518, 541 [statement "made about two and one-half hours" after a shooting was spontaneous where declarant "could not stop his body from shaking nor stem the flow of tears"]; *People v. Raley* (1992) 2 Cal.4th 870, 893-894 [victim's statements about sexual assault 18 hours later were spontaneous because

she "was in mental agony and in severe pain" and "in no condition to fabricate"]; see *People v. Sanchez, supra*, 7 Cal.5th at p. 39 [trial court did not abuse its discretion in admitting statements by five-year-old boy to police officers while he was emotional and crying one and a half hours after he witnessed the killing of his mother].)

Cindy was crying and visibly distraught when she told Officer Luna just after emerging from the tent that Daniels had hit her and Selina, pulled down his pants, brandished a long knife, and made them perform oral sex. According to Sergeant Vargas, when Cindy arrived at the police station after leaving her tent, she was still nervous and upset. The trial court did not abuse its discretion in admitting Cindy's statements as spontaneous statements because the forcible oral copulation and confinement were occurrences startling enough to produce nervous excitement; the statements were made under the stress of excitement without time to contrive them; and the statements related to Daniels's threats and forced oral copulation. (*People v. Sanchez, supra*, 7 Cal.5th at p. 39; *People v. Penunuri, supra*, 5 Cal.5th at pp. 152-153.)

D. *Any Violation of Daniels's* Miranda *Rights Was Harmless Error*

1. *The trial court proceedings*

Before trial, the prosecutor sought to admit statements Daniels made to Officer Carrillo as Daniels exited the tent and walked out of the encampment toward the freeway for a field showup. Defense counsel objected to admission of Daniels's statements on the basis they were made while Daniels was in handcuffs in police custody. After viewing the video from Officer

33

Carrillo's body camera, the trial court found there was no custodial interrogation, reasoning, "There was custody. Mr. Daniels was in handcuffs and being led up for a field show-up. The tone throughout, however, is a pretty friendly one with—between the officers who were familiar with Mr. Daniels and Mr. Daniels. [¶] I can't hear what exactly prompted him to begin speaking. However, the officer said nothing more than to inform him what one of the alleged victims said. Wasn't asking him about it. Didn't ask him to explain it."

During trial, the prosecutor played a video of Officer Carrillo's conversation with Daniels that was recorded by Officer Carrillo's body camera as Daniels walked with Officer Carrillo and two other officers from Cindy's tent through the encampment toward the freeway for a field showup. Daniels told Officer Carrillo, "You go. You can search. You can search me. I, I'm not on probation or parole or anything, but you know [unintelligible] I'll waive my [F]ourth [Amendment] right willingly." Daniels reminded Officer Carrillo he "beat" the case in "the last incident." Daniels inquired, "Can you guys tell me what this is about, Officers?" Daniels later asked, "Who called the police on me? Who called the police?"

Daniels continued spontaneously to talk as he walked through the encampment. He repeated, "Please tell me who called—." Officer Carrillo responded, "I'll, you know what, I'll tell you. Someone said that you forced them to, and I quote from her statements, . . . 'To suck your dick.'" Daniels inquired, "Hmm? I forced her to?" Officer Carrillo replied, "That's what she said, yes." Daniels stated, "Oh, hold up, you talking about S[e]lina? I knew she was going to—I said—oh, no, here's what I said, I said, 'Dude, I came back and there's a naked-ass fucking man, uh,

34

where I sleep, in my spot.  Bitch, you suck some dick right now, whether you like it or not."  Officer Carrillo asked, "Is that what happened?"  Daniels answered, "On my mama.  Because I came back, there was another nigger like in my bed naked, and you got breakfast cooked for him, and I just recycled, I bought your ass a phone.  Oh hell no, y'all bitches got me fucked up. . . .  And then liked it when she was doing it."  Daniels was laughing as he described what had happened.  Officer Carrillo queried, "S[e]lina?"  Daniels responded, "Yeah."  Daniels added, "Oh, Cindy was there too."  Officer Carrillo stated, "Okay, we'll talk to her and see if we can get to the bottom of it."  Daniels continued, "No, she—yeah, yeah, she was there. . . .  I was like, wait a minute, 'cause I'm sleeping down there."  Daniels added, "I come back.  I said, 'Cindy, I'm, I'm trying to get to bed.'  So I, uh, and she was cleaning up.  She had a clothes brush.  So I go down there and sleep.  I wake up.  I see this nigger, Chavarro, wait, wait, naked, I'm like, 'What the fuck, nigger?'  Breakfast, and I'm like, 'Oh, what the—?' like a nigger you know, that's like saying, . . . you know, I'm like 'Wait a minute, huh?'"  Officer Carrillo stated, "That sounds super-disrespectful."  Daniels responded, "Yeah, on my—I'm like, 'Okay, these bitches—.'"

At that point Officer Carrillo interrupted to speak with another officer to discuss the location of the field showup.  Daniels continued to talk, "Hell yeah, you said, she said that sound very disrespectful."  Officer Carrillo answered, "Yeah."  Daniels responded, "I was like, 'Wait a minute, breakfast?  I'm out here recycling, hot and sweaty.  I get—I pay your phone bill.'"  The police officers then communicated with other officers about their location.  Daniels continued without prompting, "[Unintelligible] that bitch shit, it's like the bitch shit, the bitch

shit, the lying, frustration, et cetera, et cetera. I want to fight. They'll pull a knife on me and then tell me they'll press charges . . . . Right there. I can't, I can't, I just can't—you see those two tents down there? I just kicked them out. I said, 'I'm tired of you' 'cause they're like bitches. I'm tired of you guys' bitch shit. I'm tired of being humble. Once I bring the bitch at you, and now, now, now you want to call the police [unintelligible]." Officer Carrillo asked, "So this, this whole spot is yours?" Daniels responded, "Huh? If I want it to be. But I share, we, we share with other people. But now I'm kicking—I'm done. Like I try to be nice and humble, but after today I'm tired. I'm kicking you guys out. I'm kicking you guys out. Every time— I don't got to nothing, the police get called. I get knives pulled on me."

Daniels stated he was staying with Cindy and the tent he just left belonged to Cindy. Daniels repeated he had been "hustling, recycling" to pay for Cindy's phone bill for the past three days. Further, Cindy used his money to "get dope and getting high with another nigger while" Daniels was gone. Officer Carrillo commented, "That sounds terrible." Daniels replied, "Dude, now when I woke up, I saw—all I just saw— where I, where I stay, sleep my head at, like this is a naked nigger. Like I see—I look, there was eggs and shit. Wait a minute, I haven't gotten breakfast cooked for me in a fucking minute. All I've been doing is getting yelled at for no fucking reason. I'm pissed the fuck off . . . ."

2. *Governing law*

Before the police can conduct a custodial interrogation, the suspect must first be advised of his or her right to remain silent, to the presence of an attorney, and to appointed counsel if indigent.  (*Miranda, supra*, 384 U.S. at p. 479; *Young, supra*, 7 Cal.5th at p. 923.)  "A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case."  (*People v. Jackson* (2016) 1 Cal.5th 269, 339; accord, *Young*, at p. 923.)

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.  The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.  This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.  A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.  But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response."  (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301-302, fns. omitted; accord, *People v. Hensley* (2014) 59 Cal.4th 788, 810-811 ["'The police may speak to a suspect in custody as long as the speech would not reasonably

37

be construed as calling for an incriminating response.'"]; *People v. Gamache* (2010) 48 Cal.4th 347, 387 (*Gamache*) ["'"Interrogation" consists of express questioning, or words or actions on the part of the police that "are reasonably likely to elicit an incriminating response from the suspect."'"].)

"'[S]tatements volunteered when not in response to an interrogation are admissible against a defendant, even after an initial assertion of the right to remain silent.'" (*People v. Roldan* (2005) 35 Cal.4th 646, 735, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22; accord, *Gamache, supra*, 48 Cal.4th at p. 387.) "'Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review.'" (*People v. Leon* (2020) 8 Cal.5th 831, 843; accord, *People v. Jackson* (2016) 1 Cal.5th 269, 339.)

3. *Officer Carrillo's initial conversation with Daniels was not an interrogation under* Miranda*, and to the extent the officer's later questioning violated* Miranda*, it was harmless error*

Daniels argues Officer Carrillo's banter with him was an impermissible tactic used to soften him up to induce incriminating statements without the benefit of *Miranda* warnings, relying on *People v. Gurule* (2002) 28 Cal.4th 557, 602 and *People v. Honeycutt* (1977) 20 Cal.3d 150, 160-161. But in *Gurule*, the Supreme Court rejected the defendant's suggestion "that by engaging in small talk [the officers] improperly 'soften[ed] him up' before extracting a *Miranda* waiver" because they did not discuss the victim and there was no evidence "suggesting that the manner in which [the officers] engaged in

38

small talk overbore defendant's free will." (*Gurule*, at p. 602.)  By contrast, in *Honeycutt*, a detective whom defendant "had known through police contacts for about 10 years" engaged in "a half-hour unrecorded discussion" with defendant about "unrelated past events and former acquaintances and, finally, the victim," and the officer disparaged the victim.  (*Honeycutt*, at p. 158.)  The Supreme Court held, "When the waiver results from a clever softening-up of a defendant through disparagement of the victim and ingratiating conversation, the subsequent decision to waive without a *Miranda* warning must be deemed to be involuntary for the same reason that an incriminating statement made under police interrogation without a *Miranda* warning is deemed to be involuntary." (*Id.* at pp. 160-161.)

Here, Officer Carrillo had developed a rapport with Daniels because they frequented the same convenience store and Officer Carrillo had previously arrested Daniels.  But in their initial small talk, Officer Carrillo did not discuss Cindy or Selina or engage in an "'ingratiating conversation'" with Daniels reasonably likely to elicit an incriminating statement.  (*Young, supra*, 7 Cal.5th at p. 925 [record "does not reveal any similarly improper efforts at 'ingratiating conversation' concerning unrelated topics or 'disparagement of the victim[s]'"]; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1087 [questions by officers to establish rapport with defendant did not constitute interrogation]; *People v. Scott* (2011) 52 Cal.4th 452, 478 [distinguishing *Honeycutt* because interrogating officers did not seek to ingratiate themselves with defendant by discussing unrelated past events and acquaintances, or disparage the victim].)

39

Daniels can be seen in the body camera footage continuing to talk as Officer Carrillo escorted him through the encampment toward the freeway. Officer Carrillo did not mention Cindy or Selina in their initial conversation. Officer Carrillo's only mention of the incident was in response to Daniels's repeated inquires as to who had called the police and why he was arrested. That led Daniels to describe the incident, laughing as he discussed having a naked man in his bed. Without prompting, Daniels admitted he responded to the naked man being in his bed by saying to Selina, "Bitch, you suck some dick right now, whether you like it or not," and "[Y]'all bitches got me fucked up . . . . And then liked it when she was doing it."

Officer Carrillo's neutral inquiries in response to Daniels's spontaneous and continuing monologue did not convert Daniels's admissions into an interrogation. (See *Gamache, supra*, 48 Cal.4th at p. 388 [detective's inquiry about defendant's military service "did not convert [defendant's] volunteered admissions into the product of interrogation"]; *People v. Haley* (2004) 34 Cal.4th 283, 302 ["A brief statement informing an in-custody defendant about the evidence that is against him is not the functional equivalent of interrogation because it is not the type of statement likely to elicit an incriminating response."]; *People v. Ray* (1996) 13 Cal.4th 313, 338 ["The entire confession was given in narrative, almost rambling form. To the extent [the prison official] interrupted and asked questions, they were merely 'neutral inquir[ies]' made for 'the purpose of clarifying [statements] or points that [he] did not understand.' [Citation.] Nothing in the substance or tone of such inquiries was reasonably likely to elicit information that defendant did not otherwise intend to freely provide."].)

40

It was only after Daniels admitted that he ordered Selina to "suck some dick right now, whether you like it or not," that Officer Carrillo asked, "Is that what happened?" This question was more likely to elicit an incriminating response by asking Daniels to confirm whether that was what had happened. But even if this inquiry was in violation of Daniels's *Miranda* rights, admission of Daniels's response was harmless error because Daniels merely repeated his story that he saw a naked man in his bed, with the additional detail that Cindy had made the man breakfast. Although Daniel added that Selina and Cindy were in the tent, this was never in dispute. Nor was it relevant that Cindy had cooked the naked man breakfast. Under these circumstances, any error in admitting Daniels's statements following Officer Carrillo's further inquiry was harmless beyond a reasonable doubt. (*People v. Case* (2018) 5 Cal.5th 1, 22 [admission of defendant's pretrial statements in violation of *Miranda* "'reviewed for prejudice under the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 . . . . That test requires the People . . . "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."'"]; see *People v. Cunningham* (2001) 25 Cal.4th 926, 994 [admission of evidence in violation of *Miranda* was harmless beyond a reasonable doubt].)

## DISPOSITION

The judgment is modified to strike the personal use weapon enhancement imposed and stayed on count 5.  As modified, the judgment is affirmed.  The superior court is directed to prepare a corrected abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.


FEUER, J.

We concur:


PERLUSS, P. J.


RICHARDSON, J.*

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.